1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10   STEVEN KRAVETZ,

11                          Petitioner,          CASE NO. 3:19-CV-5050-RJB-DWC

12          v.                                   REPORT AND RECOMMENDATION

13   MIKE OBENLAND,                              Noting Date: November 22, 2019

14                          Respondent.

15          The District Court has referred this action to United States Magistrate Judge David W.

16   Christel. Petitioner Steven Kravetz, through retained counsel James Lobsenz, filed his federal

17   habeas Petition ("Petition"), pursuant to 28 U.S.C. § 2254, seeking relief from his state court

18   convictions and sentence. *See* Dkt. 1. The Court concludes the state court's adjudication of

19   Ground 1, the sole ground raised in the Petition, was not contrary to, or an unreasonable

20   application of, clearly established federal law. Therefore, the undersigned recommends the

21   Petition be denied and a certificate of appealability not be issued.

22

23

24

REPORT AND RECOMMENDATION - 1

# I.    Background

A.  <u>Factual Background</u>

The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

A. The Incident

On March 9, 2012, Kravetz went to the Grays Harbor County Courthouse. Kravetz was standing around and a court administrator became suspicious. The administrator reported Kravetz to the sheriff's office.

Sheriff's Deputy Polly Davin went to the courthouse and contacted Kravetz. She asked him for his name and identification. Kravetz told her his name was Michael Thomas because he knew he had an outstanding bench warrant. Deputy Davin then reached for Kravetz's elbow to steer the conversation outside. At that point, Kravetz grabbed Deputy Davin, threw her on the ground, and got on top of her. A judge in the courthouse came downstairs and pushed Kravetz off the deputy. Kravetz stabbed the judge in the neck. Deputy Davin drew her gun, but Kravetz took it away from her, took a step back, and shot her in the arm. Kravetz then left the courthouse.

B. The Warrant and Search

The next day, Kravetz's mother called the police after hearing that they were looking for her son. Kravetz's mother told the police where she lived with Kravetz and gave them permission to search the home.

The police got a search warrant to search the home. Police then went to Kravetz's home where they arrested Kravetz and searched the home. The police found the gun, knife, clothes, and bag in the home. The police also found in some boxes in the garage[,] a brochure with a sketch of the Grays Harbor County Courthouse[,] and a file marked "master plan" with pictures and information on Sheriff's Deputy David Libby. The police collected these items and documents and put them into evidence.

C. Trial

The State charged Kravetz with second degree attempted murder, along with a firearm sentencing enhancement and an aggravating factor that he knew the victim was a law enforcement officer performing her official duties (count 1); first degree assault, along with a firearm sentencing enhancement and an aggravating factor that he knew the victim was a law enforcement officer performing her official duties (count 2); disarming a law enforcement officer (count 3); and first degree assault,

along with a deadly weapon sentencing enhancement (count 4). Kravetz claimed diminished capacity.

1. Admission of Sketch, Libby Photograph, and Police Interview

At trial, the sketch and Libby's photograph were admitted. The recording of Kravetz's police interview was also admitted and played for the jury. In his police interview, Kravetz stated that he believed that there was a conspiracy to cover up an incident between him and the police in 2005 and that there was information the county did not want the public to see. He was trying to obtain information that would identify and expose the people involved in the 2005 incident where he claimed he was raped. He admitted that he had been to the courthouse previously as part of a recognizance (sic) trip. He obtained a photograph of and some personal information on Deputy Libby.

Kravetz explained that in 2005, his mother called the police. The police took the call as a suicide complaint, and Deputy Libby and other officers came to Kravetz's home. Deputy Libby frisked Kravetz and took him to the hospital for a mental health evaluation. At the hospital, Kravetz refused attempts to take his temperature and to provide a urine sample. After he tried to escape, a rectal thermometer and catheter were used to obtain his temperature and urine sample. Kravetz was then taken to jail where he said he was strip searched and shot with a stun gun after refusing to comply. This experience traumatized Kravetz. Kravetz believed he was raped and wanted to identify the people involved.

Kravetz further explained that he was at the courthouse on March 9 to find and take the files for two cases he had been involved in. He wanted to get the case files to expose the county even though he knew it would be illegal. Kravetz acknowledged that his actions were not legally justified and morally wrong.

2. Doctors' Testimony on Kravetz's Mental Health

Dr. David Dixon diagnosed Kravetz with delusional disorder and paranoid personality. He believed that Kravetz was preoccupied by a delusion that he had been raped in 2005, and the delusion "was interrupting, constricting his life, dominat[ing] his insight, comprehension and judgment." 5 Verbatim Report of Proceedings (VRP) at 438. Dr. Dixon stated that Kravetz's contact with the sheriff's deputy at the courthouse triggered his fear of being apprehended and assaulted. Dr. Dixon opined that although Kravetz was driven by a delusional system and impaired, he had the capacity to act with intent. And Kravetz was able to "form purpose," had the ability to perform "purposeful goal oriented behaviors," and knew right from wrong. 5 VRP at 426, 462.

Dr. Brett Trowbridge diagnosed Kravetz with delusional paranoid disorder. Dr. Trowbridge stated that Kravetz's previous interactions with police led him to fear that any contact with a sheriff's deputy would lead to rape because he viewed a

normal search as some sort of sexual assault. Dr. Trowbridge believed that Kravetz knew right from wrong, could appreciate the quality of his acts, and knew his actions were legally wrong. Dr. Trowbridge also stated that Kravetz could act intentionally and was not impaired in that area, and that his actions were goal oriented but based on a delusion that Grays Harbor County was trying to rape him.

Dr. Marilyn Ronnei diagnosed Kravetz with a psychotic disorder, most likely paranoid schizophrenia. Dr. Ronnei stated that Kravetz had a delusion that stemmed from a 2005 incident, Kravetz likely spent seven years ruminating daily over the incident, and Kravetz was still preoccupied with the incident during his evaluation. Dr. Ronnei opined that Kravetz could act intentionally with the purpose to accomplish a result despite his persecutory delusions. Kravetz's capacity to form intent was not impaired.

D. Verdict and Sentencing

The jury found Kravetz not guilty of second degree attempted murder (count 1). But the jury found Kravetz guilty of first degree assault on Deputy Davin (count 2), disarming a law enforcement officer (count 3), and second degree assault on the judge (count 4). For first degree assault, the jury also found that Kravetz was armed with a firearm during the commission of the offense, the offense was committed against a law enforcement officer who was performing her official duties, and Kravetz knew when he committed the offense that the victim was a law enforcement officer. And for second degree assault, the jury found that Kravetz was armed with a deadly weapon during the commission of the offense.

. . . .

The sentencing court imposed an exceptional sentence of 240 months for the first degree assault conviction, along with an additional 60 months for the firearm enhancement. The sentencing court also found that an exceptional sentence upward was justified because the jury found that Kravetz committed the crime against a law enforcement officer performing her official duties and knew that she was a law enforcement officer when committing the crime. For the unlawfully disarming a law enforcement officer conviction, the sentencing court imposed a standard range sentence of 364 days. For the second degree assault conviction, the sentencing court imposed a standard range sentence of 20 months, along with an additional 12 months for the deadly weapon enhancement.

*Matter of Kravetz*, 2017 WL 6492896, at *1–3 (Wash. Ct. App. Dec. 19, 2017); *see also* Dkt. 5-1, pp. 18-22.

B. <u>Procedural Background</u>

       1. *Direct Appeal*

Petitioner challenged his Lewis County Superior Court[1] convictions and sentence on direct appeal. *See* Dkt. 5-1, pp. 38, 65. The state court of appeals affirmed Petitioner's convictions and sentence. *Id*. at pp. 114-20. Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *See id*. at pp. 122-50. On August 5, 2015, the state supreme court denied Petitioner's petition for review without comment. *Id*. at p. 152. The state court of appeals issued its mandate on August 14, 2015. *Id*. at p. 154.

       2. *Personal Restraint Petition*

On August 10, 2016, Petitioner filed a personal restraint petition ("PRP") seeking state post-conviction relief. *See* Dkt. 5-2. The state court of appeals denied the PRP on December 19, 2017. Dkt. 5-1, pp.17-36. Petitioner sought discretionary review from the state supreme court, which was denied by the deputy commissioner of the state supreme court on July 19, 2018. Dkt. 5-3, pp. 169-220, 222-27. Petitioner moved to modify the deputy commissioner's decision. *Id*. at pp. 229-88. The state supreme court denied the motion to modify and the state court of appeals issued the certificate of finality on November 20, 2018. *Id*. at pp. 290, 292.

       3. *Federal Petition*

On January 16, 2019, Petitioner filed his Petition (Dkt. 1) raising the following ground:

> Petitioner's conviction is contrary to the Constitution of the United States because his trial attorney provided ineffective assistance of counsel and thus denied Petitioner Kravetz's rights under the Sixth Amendment to the U.S. Constitution.

---

[1] The venue for Petitioner's trial was changed from Grays Harbor County to Lewis County. *See* Dkt. 5-1, p. 114 n.2.

1    Dkt. 1, p. 6. On March 11, 2019, Respondent filed, and served on Petitioner's counsel, an

2    Answer and Memorandum of Authorities. Dkt. 4. In the Answer, Respondent asserted the state

3    court's adjudication of the sole ground raised in the Petition was not contrary to, or an

4    unreasonable application of, clearly established federal law. *Id.*

5         Petitioner's response to the Answer was due April 1, 2019. Petitioner did not file a

6    response to the Answer. On April 18, 2019, Petitioner, through his counsel, filed a Motion for

7    Summary Judgment and a supplemental state court record. Dkt. 6, 7. The Court struck the

8    Motion for Summary Judgment and supporting documents because Petitioner failed to follow the

9    Court's Order regarding filing a response to the Answer, but allowed Petitioner the opportunity

10   to file a response to the Answer. *See* Dkt. 9. On May 13, 2019, Petitioner filed a statement titled

11   Petitioner's Decision Not to File a Reply to the Respondent's Answer, wherein he stated he

12   would not file a response to the Answer and would renew his summary judgment motion once

13   the Court indicated a summary judgment motion could be filed. Dkt. 10.

14        On June 17, 2019, the Court directed Respondent to file a supplemental state court

15   record. Dkt. 11. The Court also notified the parties that the Court would issue a report and

16   recommendation on the merits of the Petition without consideration of motions for summary

17   judgment. *Id*. On August 13, 2019, Respondent filed the supplemental state court record and the

18   Supplemental Answer. Dkt. 15-17. Petitioner filed a Reply to Supplemental Answer on

19   September 16, 2019. Dkt. 18.

20   **II.    Discussion**

21        Respondent maintains the state courts' adjudication of Ground 1 -- the sole ground raised

22   in the Petition -- was not contrary to, or an unreasonable application of, clearly established

23   federal law. Dkt. 9, 16.

24

REPORT AND RECOMMENDATION - 6

A.  <u>Standard of Review</u>

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

1    The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas

2    courts to presume the correctness of state courts' factual findings unless applicants rebut this

3    presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of

4    state court decisions under §2254(d)(1) is "limited to the record that was before the state court

5    that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

6    B.    Ineffective Assistance of Counsel

7        In the Petition, Petitioner alleges he received ineffective assistance of counsel when

8    Petitioner's trial counsel failed to move to suppress a hand drawn sketch of the courthouse where

9    the assaults occurred and photograph(s) of Deputy David Libby ("seized items"). Dkt. 1, 18.

10   Petitioner asserts that, if his trial counsel had moved to suppress the seized items, there is a

11   reasonable probability the outcome of the trial would have been different. *See* Dkt. 1, 18.

12   Specifically, Petitioner argues that, if the seized items had not been admitted into evidence, the

13   jury would have convicted Petitioner of Assault 2, not Assault 1, upon Deputy Davin. Dkt. 18,

14   pp. 47-48.

15       1.   *Legal Standard*

16       In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part

17   test for determining whether a defendant received ineffective assistance of counsel. First, a

18   defendant must demonstrate his attorney's performance was deficient, which requires showing

19   "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by

20   the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient

21   performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

22       Under the first prong, the reasonableness of an attorney's performance is to be evaluated

23   from counsel's perspective at the time of the alleged error and in light of all the circumstances.

24

REPORT AND RECOMMENDATION - 8

1   *Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

2   presumption that counsel's conduct falls within the wide range of professional assistance; that is,

3   the defendant must overcome the presumption that, under the circumstances, the challenged

4   action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

5          Under the prejudice prong, a petitioner must establish there is a reasonable probability the

6   results would have been different but for counsel's deficient performance. *Kimmelman v.*

7   *Morrison*, 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

8   probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]

9   court need not determine whether counsel's performance was deficient before examining the

10  prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to

11  dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

12  should be followed." *Id*. at 697.

13         2.  *State Court Decision*

14         In determining Petitioner's trial counsel was not ineffective for failing to move to

15  suppress the seized items, the state supreme court stated:

16      Mr. Kravetz also contends that trial counsel was ineffective in not moving to
    suppress evidence found in the search of his mother's home. To establish
17  ineffective assistance, a petitioner must show that counsel's performance fell below
    an objective standard of reasonableness in light of all the circumstances, and that
18  in the absence of counsel's deficient performance there is a reasonable probability
    that the result of the proceeding would have been different. *In re Pers. Restraint of*
19  *Crace*, 174 Wn.2d 835, 843-46, 280 P.3d 1102 (2012); *Strickland v. Washington*,
    466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If the petitioner fails
20  to establish either element of his claim, the court need not address the other element.
    *State v. Hendrickson*, 129 Wn.3d 61, 78, 917 P.2d 563 (1996). Counsel's
21  performance is strongly presumed to have been reasonable, and conduct that can be
    characterized as legitimate trial strategy is not deficient. *State v. Grier*, 171 Wn.2d
22  17, 33, 246 P.3d 1260 (2011). The presumption of reasonableness can be overcome
    only by showing there is no conceivable legitimate tactical reason for counsel's
23  conduct. *Id*.

24

Mr. Kravetz claims that the search warrant for his mother's home was overbroad, and that the brochure and file folder that were seized were outside the scope of the warrant. Mr. Kravetz may have a point: police had probable cause to look for the gun, the knife, and items from the assault, not documents. But Mr. Kravetz fails to demonstrate any reasonable probability that the result of the proceeding would have been different had the file folder and related documents been excluded. The documents supported the State's theory of criminal intent, but there was significant evidence of intent, including witness testimony and surveillance video of the assault. There is no reasonable probability that the jury would have acquitted Mr. Kravetz had the documents been excluded.

Dkt. 5-3, pp. 226-27.[2]

3. *Prejudice*

As the state court declined to consider whether Petitioner's trial counsel was deficient, this Court will first review the prejudice prong of the *Strickland* standard. *See Crace v. Herzog*, 798 F.3d 840, 846 (9th Cir. 2015) ("We analyze the question of prejudice first, since it is the only prong of *Strickland* that the Washington Supreme Court addressed."). To establish prejudice, Petitioner "must establish that had the motion [to suppress] been filed, there was a reasonable probability that the evidence would have been suppressed, and the outcome of the trial would have been different had the evidence been suppressed." *Lowry v. Lewis*, 21 F.3d 344, 346–47 (9th Cir. 1994).

Here, the state supreme court found Petitioner had not shown he was prejudiced by counsel's performance. Dkt. 5-3, pp. 226-27. Specifically, the state supreme court determined that, while the seized items supported the State's theory of intent, there was significant evidence of intent, including witness testimony and surveillance video of the assault. *Id*. The state supreme

---

[2] The state supreme court found the State's theory of criminal intent was supported by "surveillance video of the assault." The parties agree no "video surveillance of the assault" exists. Dkt. 20. The state court record does, however, contain video surveillance of Petitioner riding the bus on the day of the assaults. *See* Dkt. 15-1, pp. 485-93; *see also* Docket.

1  court found there was, thus, no reasonable probability the jury would have reached a different

2  result had the seized items been suppressed. *Id*.

3        At trial, the seized items were admitted into evidence without objection from Petitioner's

4  trial counsel. Dkt. 15-1, pp. 475-83. The prosecutor used the seized items to support the State's

5  theory that Petitioner had the necessary intent to commit Attempted Murder and Assault I.

6  During closing arguments, the prosecutor spoke of Petitioner's activities on March 9, 2012, the

7  date of the assaults. *Id*. at p. 830. The prosecutor mentioned the hand drawn sketch of the

8  courthouse when stating Petitioner had scouted the courthouse in the month prior. *Id*. at p. 831.

9  The prosecutor also argued the map showed Petitioner was not mentally ill. *Id*. at pp. 881-83.

10  While the prosecutor did not explicitly reference the photographs of Deputy David Libby, he

11  argued Petitioner has a long-standing hatred for police officers and had researched Deputy

12  Libby. *Id*. at p. 841.

13        The seized items were not, however, the only evidence presented to the jury regarding

14  Petitioner's ability to form intent. Petitioner's recorded statements, made to law enforcement

15  officers the day after the assaults, were played for the jury. *See* Dkt. 15-1, pp. 536, 621, 626-32.

16  Petitioner stated, under penalty of perjury, that he went to the courthouse on February 3, 2012

17  and March 9, 2012 to take his case file from the prosecutor's office. Dkt. 5-2, pp. 156, 303-07,

18  379. Petitioner explained that, on March 9, 2012, a female deputy – Deputy Polly Davin --

19  approached him; he felt scared because of his past experiences with law enforcement and was

20  uncomfortable because Deputy Davin was a female. *Id*. at pp. 311, 358. Petitioner discussed the

21  assault of Deputy Davin, explaining he attacked her with his knife because he wanted to do

22  something that would hurt her "just enough to stop [her] temporarily." *Id*. at p. 312. Petitioner

23  stated a male – Judge David Edwards – pushed him away from Deputy Davin. *Id*. at p. 317.

24

Deputy Davin "pulled out a firearm." *Id*. at p. 322. Petitioner thought he was going to be shot, so he grabbed the gun from Deputy Davin, pointed it at the center of her body, and fired two shots. *Id*. pp. 322-32. He said the shooting was "an instinctive thing that was brought on by fear." *Id*. at p. 364. After he left the courthouse, he changed clothes, had someone call his mother, and waited for her to pick him up. *Id*. at p. 341-46.

During his interview with law enforcement officers, Petitioner also explained he went to the courthouse on February 3, 2012, a month prior to the assault, for a reconnaissance trip. Dkt. 5-2, p. 367. He stated he drew a map of the courthouse on that date. *Id*. at p. 368. Additionally, Steve Youmans, a corrections officer, testified that, on February 3, 2012, an individual was at the courthouse watching people and taking notes. Dkt. 15-1, pp. 410-15. Petitioner also discussed his research about Deputy Libby with the law enforcement officers. Dkt. 5-2, p. 369. Petitioner explained he had no intention to do any harm to the individuals involved in the 2005 incident, including Deputy Libby, but wanted to identify them because he is a "stickler for information." *Id*. at pp. 370-71.

Witnesses to the assaults also testified at trial. The eyewitnesses testified that Petitioner made no attempts to escape or flee during the incident. Rather, Petitioner was the aggressor the entire time. For example, Deputy Davin testified Petitioner never tried to let go of her or stop the struggle to escape. Dkt. 15-1, p. 312. She also testified Petitioner never tried to escape after Deputy Davin pulled her weapon. *Id*. at p. 313. After taking the gun from Deputy Davin, Petitioner kept the gun pointed at Deputy Davin, despite Deputy Davin moving and struggling under Petitioner. *Id*. at p. 318. Judge Edwards testified Petitioner did not make any effort to break away from him and flee. *Id*. at p. 357. He also stated Petitioner never showed any indication he wanted to disengage from the struggle and leave. *Id*. at p. 360. Judge Edwards

testified that, in fact, Petitioner "was on the attack the entire time." *Id*. The eye witnesses

testified that Petitioner walked from the building after shooting Deputy Davin. *See id*. at p. 298

(did a hurried walk out the door), p. 340 (calmly walked out the door).

Further, the jury viewed video surveillance from the day of the assault. *See* Dkt. 15-1, pp.

485-93. Prior to the assault, video surveillance showed Petitioner getting on a bus, asking if the

bus was going to Montesano, Washington, the city where the courthouse is located, and then

departing the bus in Montesano. *Id*.

In addition to the eye witness testimony and video surveillance, during the trial, medical

experts testified regarding Petitioner's mental capacity to form intent. Dr. David Dixon, Ph.D.

and Dr. Brett Trowbridge, Ph.D. diagnosed Petitioner with a delusional disorder. *See* Dkt. 15-1,

pp. 677-78, 727-28. Dr. Marilyn Ronnei, Ph.D. diagnosed Petitioner with a psychotic disorder,

either paranoid schizophrenia or a delusional disorder. *Id*. at p. 751. The three doctors testified

that Petitioner was fixated on his perceived rape by law enforcement officers in 2005. *See id*. at

pp. 677-78, 722, 758, 764. The three doctors also opined Petitioner's acts before, during, and

after the assault were intentional. Dr. Dixon testified Petitioner acts during the assaults were

intentional, but every behavior was affected by Petitioner's overriding delusion. *See id*. at pp.

697-99. Dr. Trowbridge found Petitioner's actions on the day of the assault were goal directed,

although "crazy." *Id*. at pp. 729-30. He found nothing to indicate Petitioner was impaired in his

ability to form an intent to kill or inflict great bodily harm and opined that Petitioner intended to

act. *Id*. at pp. 730, 736, 738. Dr. Ronnei testified Petitioner was able to act with intent to commit

acts before, during, and after the assaults, despite his delusions. *Id*. at pp. 752-56, 768

(Petitioner's delusion "had no effect on his ability to act intentionally").

1    Review of the state court record shows the seized items were trivial to the outcome of the

2    trial. *See Strickland*, 466 U.S. at 695-96 (stating that some errors will have only "an isolated,

3    trivial effect"). As detailed above, there was a vast amount of evidence presented to the jury

4    supporting the State's theory of criminal intent. The evidence presented to the jury included

5    testimony that Petitioner initiated the assaults and never attempted to stop or flee, despite

6    opportunities to do so. The medical experts also testified that Petitioner had the ability to form

7    intent and his actions on the day of the assaults were intentional/goal directed. In addition to the

8    eyewitness testimony and the medical experts' opinions, Petitioner admitted to drawing a map of

9    the courthouse during a reconnaissance trip and admitted to researching Deputy Libby.

10   Furthermore, while Petitioner researched Deputy Libby, Deputy Libby was not a victim of the

11   assaults and the jury had ample evidence regarding Petitioner's explanation for why he traveled

12   to the courthouse on the date of the assaults.

13       Accordingly, after reviewing the totality of the evidence, the Court finds Petitioner has

14   not shown the confidence in the outcome of the trial has been undermined by counsel's failure to

15   move to suppress the seized items. *See Strickland*, 466 U.S. at 695 ("a court hearing an

16   ineffectiveness claim must consider the totality of the evidence before the judge or jury"); *Hardy*

17   *v. Chappell*, 849 F.3d 803, 819 (9th Cir. 2016) (internal quotations omitted) ("A reasonable

18   probability is sufficient to undermine confidence in the outcome and must be substantial, not just

19   conceivable."); *see also Jackson v. Calderon*, 211 F.3d 1148, 1155-56 (9th Cir. 2000) (finding

20   that counsel's failure to move to suppress the petitioner's statements did not warrant habeas

21   relief where there was no reasonable probability the exclusion of the statement would have

22   changed the outcome of the trial where two other statements were admitted); *Valencia v.*

23   *Hedgpeth*, 2010 WL 3339529, at *14 (N.D. Cal. Aug. 24, 2010), *aff'd*, 478 F. App'x 366 (9th

24

REPORT AND RECOMMENDATION - 14

Cir. 2012) (stating that, given the other, properly admitted evidence which spoke directly to the charges at issue, "there was little or no probability that the character evidence to which petitioner object[ed] played any role in the jury's deliberations").

Petitioner provides generalized statements contending the state courts erred in considering the seized items and their effect on the trial. *See* Dkt. 18, pp. 36-38. For example, Petitioner contends the state courts failed to consider evidence of Petitioner's delusional disorder, the type of intent the prosecution was required to prove, and that Petitioner was acquitted of attempted murder. *Id*. Petitioner, however, fails to provide more than speculative arguments that, had the state supreme court explicitly stated it considered the expert testimony, the specific intent, or the acquittal, the state court would have found Petitioner was prejudiced. *See Totten v. Merkle*, 137 F.3d 1172, 1175 (9th Cir. 1998) (finding the petitioner's argument that the presentation of a mental impairment defense would change the outcome of the jury verdict was speculative where there was overwhelming evidence showing the petitioner's "cognitive role"). Petitioner also argues the prosecutor relied heavily on the seized items in his closing argument. *See* id. Yet, a review of the prosecutor's closing argument fails to support Petitioner's contention. *See* Dkt. 15-1, pp. 822-47, 879-91. Thus, the Court is not persuaded by Petitioner's arguments.

Petitioner also argues the state supreme court applied the wrong standard in determining Petitioner was not prejudiced. Dkt. 18. Citing to *Crace* and *Hardy*, Petitioner contends the state supreme court's decision is contrary to and an unreasonable application of clearly established law because the state supreme court applied the heightened sufficiency-of-evidence standard. *See id*. at pp. 33-44.

1    In *Crace,* the Ninth Circuit rejected the state supreme court's assertion that no prejudice

2    could result from a defense attorney's failure to request a lesser-included-offense instruction as

3    long as there was sufficient evidence to support the verdict. *See Crace*, 798 F.3d at 849. The

4    Ninth Circuit reasoned that the state court's decision "in essence converted *Strickland's*

5    prejudice inquiry into a sufficiency-of-the-evidence question–an entirely different inquiry

6    separately prescribed by *Jackson....*" *Id.*; *see also Hardy*, 849 F.3d at 819.

7    However, *Crace* and *Hardy* are distinguishable because, here, the state supreme court

8    cited to the proper *Strickland* prejudice standard and correctly applied the standard to the facts of

9    this case. The state supreme court did not provide a great amount of detail in its decision.

10    However, it is clear the state supreme court did not find there was sufficient evidence to convict

11    Petitioner of the charged crimes. Rather, the state supreme court found there was significant

12    evidence in the record – beyond the two seized items – showing the State's theory of criminal

13    intent as related to the charged crimes. *See* Dkt. 5-3, pp. 226-27. The Court, therefore, concludes

14    the state supreme court did not apply a heightened standard of review to this case.

15    Moreover, even if the state supreme court applied a heightened standard in determining

16    Petitioner was not prejudiced by trial counsel's failure to move to suppress the seized items, this

17    Court finds Petitioner has not shown he suffered prejudice under *Strickland* as a result of trial

18    counsel's conduct. *See Hardy*, 849 F.3d at 820 (finding that if the state court used the wrong

19    standard, the federal court need not defer to the state court decision and can review the claim *de*

20    *novo*).

21    *Strickland* asks whether it is "reasonably likely" the result would have been
      different. This does not require a showing that counsel's actions "more likely than
22    not altered the outcome," but the difference between *Strickland*'s prejudice
      standard and a more-probable-than-not standard is slight and matters "only in the
23    rarest case." The likelihood of a different result must be substantial, not just
      conceivable.

24

*Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (quoting *Strickland*, 466 U.S. at 693) (internal citations omitted).

As discussed above, the totality of the evidence in this case shows the likelihood of a different result was not substantial, nor conceivable, if the seized items had been excluded from the evidence. For example, there was eyewitness testimony, video surveillance, and Petitioner's own statements admitting he gathered information on Deputy Libby and created a map of the courthouse during a reconnaissance trip. Further, medical experts opined Petitioner had the ability to form intent, despite any delusional disorder. The seized items supported a small portion of the total evidence presented to the jury. Therefore, Petitioner has not shown prejudice under the *Strickland* standard.

For the above stated reasons, the Court finds Petitioner has not shown the state supreme court's decision that Petitioner was not prejudiced by his counsel's failure to move to suppress the seized items was contrary to, or an unreasonable application of, clearly established federal law.

4. *Deficient Performance*

The Court finds Petitioner has not shown he was prejudiced by his counsel's failure to move to suppress the seized items. Therefore, the Court need not determine whether Petitioner's trial counsel's failure to file a motion to suppress was deficient performance or whether the trial court would have granted the motion to suppress had such a motion been filed.

The Court, however, notes Petitioner did not provide any evidence, such as an affidavit from his trial attorney, explaining why his trial counsel did not move to suppress the seized items to show counsel's performance was deficient. *Compare Van Nguyen v. Uttecht*, 2017 WL 5054574, at *11 (W.D. Wash. July 21, 2017) (concluding the petitioner did not establish his

1  counsel's performance was deficient in failing to request a specific jury instruction where the

2  petitioner failed to provide evidence to support his assertion) *with Crace*, 798 F.3d at 853

3  (finding counsel deficient for failing to request a lesser-included jury instruction where counsel

4  explicitly stated in a declaration that he did not request a lesser-included jury instruction because

5  he did not consider it). Furthermore, Petitioner's trial counsel used the seized items, among other

6  evidence, to argue Petitioner went to the courthouse to find a way to retrieve his documents, not

7  to kill anyone. Dkt. 15-1, pp. 863-64. He also used the seized items to support his position that

8  Petitioner's mental illness resulted in Petitioner being fixated on exposing, not harming, the

9  individuals, including Deputy Libby, who he perceived raped him in 2005. *See id*.

10      While Petitioner alleges the state supreme court found Petitioner's trial counsel's

11  performance was deficient, the Court does not agree. *See* Dkt. 18, pp. 25-26. The state supreme

12  court noted that Petitioner "may have a point" regarding his claim that the seized items were

13  outside the scope of the search warrant. *See* Dkt. 5-3, pp. 226-27. The state supreme court did not

14  find counsel was deficient for failing to move to suppress the seized documents or find the trial

15  court would have granted a motion to suppress. Rather, the state supreme court decided the case

16  on the prejudice prong alone.

17      As Petitioner has not provided evidence regarding why his trial counsel did not move to

18  suppress the seized items, he has not overcome the presumption that counsel's performance was

19  not deficient in this case. *See Lopez v. Ryan*, 2009 WL 3294876, at *23 (D. Ariz. Oct. 14, 2009)

20  ("The record is silent regarding counsel's reasons for not moving to suppress the evidence, and

21  Petitioner cannot overcome the Court's presumption of reasonableness without proffering

22  affirmative evidence of counsel's decision-making process."); *see also Grayson v. Thompson*,

23  257 F.3d 1194, 1218 (11th Cir.2001) (defendant could not show deficient performance where

24

1  record was silent regarding counsel's reason for not filing motion to suppress, and court would

2  presume counsel acted reasonably).

3          5. *Conclusion*

4          In summation, Petitioner has not shown there is a reasonable probability that the outcome

5  of his trial would have been different had the seized items – a hand drawn sketch of the

6  courthouse and photograph(s) of Deputy Libby – been suppressed. Petitioner fails to show the

7  seized items were significant when viewed with all the other evidence presented at trial.

8  Therefore, Petitioner has not shown the state supreme court's decision was contrary to, or an

9  unreasonable application of, clearly established federal law. *See Harrington*, 562 U.S. at 112 (the

10 question is not whether counsel's performance had no effect or whether it is possible a

11 reasonable doubt might have been established if counsel acted different, but whether it is

12 "reasonably likely" the result would have been different); *Vieira v. Chappell*, 2015 WL 641433,

13 at *51 (E.D. Cal. Feb. 5, 2015) (finding the petitioner failed to demonstrate that no reasonable

14 jurist could have found he failed to make a prima facie showing of prejudice as a result of his

15 counsel's failure to move to suppress a knife box when the knife box was insignificant compared

16 to the other evidence connecting the petitioner to the knife).

17 **C. Evidentiary Hearing**

18         The decision to hold an evidentiary hearing is committed to the Court's discretion.

19 *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

20 hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

21 entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

22 available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

23 state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

24

1  entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

2  record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

3  court is not required to hold an evidentiary hearing." *Id*. The parties do not request an evidentiary

4  hearing in this case. *See* Dkt. 1, 4. Further, the Court does not find it necessary to hold an

5  evidentiary hearing because, as discussed in this Report and Recommendation, Petitioner's

6  ground may be resolved on the existing state court record.

7  **D.  Certificate of Appealability**

8       A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

9  court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

10 from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue

11 . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right."

12 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason

13 could disagree with the district court's resolution of his constitutional claims or that jurists could

14 conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-*

15 *El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

16      No jurist of reason could disagree with this Court's evaluation of Petitioner's claim or

17 would conclude the issues presented in the Petition should proceed further. Therefore, the Court

18 concludes Petitioner is not entitled to a certificate of appealability with respect to this Petition.

19 **E.  Conclusion**

20      For the above stated reasons, the Court concludes Ground 1 – the sole ground raised in

21 the Petition -- should be denied as Petitioner has not shown the state courts' adjudication of this

22 ground was contrary to, or an unreasonable application of, clearly established federal law. The

23

24

1   Court also finds an evidentiary hearing is not necessary. Therefore, the Court recommends the

2   Petition be denied and a certificate of appealability not be issued.

3          Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

4   fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

5   6. Failure to file objections will result in a waiver of those objections for purposes of de novo

6   review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

7   imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

8   November 22, 2019 as noted in the caption.

9          Dated this 4th day of November, 2019.

10

11

David W. Christel
United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24